ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY v. THOMAS SEEGER.

Decided December 19, 1906.

**1.—Common Law—Fellow Servant—Negligence—Proximate Cause.**

Where it appeared from the evidence that the plaintiff resided and was injured in the Territory of Arizona; that the common law was in force in said Territory; that the engineer, through whose negligence he was injured, and the plaintiff were fellow servants; that the plaintiff was injured by the engineer causing the engine to move while plaintiff was under the same cleaning the ash pan; held, that the proximate cause of plaintiff's injury was the act of the engineer in causing said engine to move, and not the leaky condition of the throttle valve, which, without the active intervention of said engineer, would not have caused the engine to move.

**2.—Great Danger—Great Care.**

Ordinary care will require the exercise of a very great degree of vigilance under some circumstances, and the amount of vigilance and caution to be used will vary according to the situation of the parties and the surrounding circumstances.

**3.—Proximate Cause.**

Proximate cause is not necessarily the nearest cause, but the act of negligence must, in order to be the proximate cause, have been the cause which, under the ordinary working of natural laws, would probably have produced the result.

**4.—Condition of Engine—Evidence.**

Where the plaintiff had introduced a part of the reports by defendant's employes as to the condition of the engine in question, the defendant should have been allowed to introduce the last report in the same book introduced by plaintiff, for the purpose of showing that at the time of the injury there was no report of the engine being defective in the particular alleged.

Appeal from the District Court of El Paso County. Tried below before Hon. J. M. Goggin.

*J. W. Terry* and *A. H. Culwell,* for appellant.—The evidence in this case and the great preponderance thereof showing as it does that the accident to appellee was the result of the negligence of engineer Hoehn and that same was not the result of the defective condition of the engine or any of its parts; that appellee and engineer Hoehn were fellow servants, the judgment should have been set aside. Joske v. Irvine, 91 Texas, 574; New England R. R. Co. v. Conroy, 175 U. S., 323; Martin v. Atchison, Topeka & S. F. Ry. Co., 166 U. S., 399; Baltimore & Ohio R. R. Co. v. Baugh, 149 U. S., 368.

The court erred in excluding from the consideration of the jury, the report made by engineer Ganoude on January 27, 1903, concerning the condition of engine 681, for the reason that plaintiff had alleged a defective engine and leaky throttle, and had introduced the reports of other engineers from the same book, which was the work book kept at the round house for the use of the engineers, and in which reports as to the condition of all engines, should be entered. Said evidence was admissible because it would have shown that engine 681, on the 27th day of January, 1903, was in good condition so far as the throttle thereof was concerned; and especially was the said evidence admissible because there was no report for repairs to the throttle to said engine since the 13th day of January, there was absolutely no evidence of any defective condition of the throttle of this engine. This report was further admissible because it was such report as was required to be kept by the engineers using said engine, and the plaintiff had already introduced said work book and other reports, vouching for the correctness thereof. Donovan v. Boston & M. R. R., 33 N. E. Rep., 583; Manchester Assurance Co. v. Oregon R. & N. Co., 69 Law Rep. Ann., 475; Diament v. Colloty, 49 Atl. Rep., 445; Callahan v. Washington Water Power Co., 56 Law Rep. Ann., 773; St. Paul F. & M. Insurance Co. v. Gotthelf, 53 N. W. Rep., 137.

The court erred in its main charge, in the eighth paragraph thereof, because the said eighth paragraph of said charge is upon the weight of the evidence, and assumes a condition of facts not established by the testimony, but in direct opposition to positive testimony, in this language of the court: "And that the engineer in charge of said engine 681 threw his reverse lever into the backward motion, and that upon his doing so the steam which had accumulated in the steam chest, if it had, escaped into the cylinder of engine 681, and it was thereby caused to and did move backwards without the engineer having opened the throttle and pushed or moved the engine of which plaintiff was cleaning the ash pan, and thereby caused the plaintiff's arm to be crushed and injured as alleged, and that the defendant company, before the said injury was inflicted upon plaintiff, had been notified of such leaky condition of such throttle valve, and had notice of the same, and that it was negligence on the part of defendant company to have furnished the said engine 681 in such condition, with a leaky throttle valve, for the prosecution of the work in hand, and that such negligence, if any, on

the part of the defendant company, was the proximate cause of said engine so starting off and injuring plaintiff."

The court erred in the tenth paragraph of its main charge in which it tells the injury, "As if the plaintiff Seeger failed to give sufficient notice of his intention to go under said engine, that in that case he could not recover," without defining or attempting to define to the jury what sufficient notice was, but leaves to the jury the right to speculate and fix any notice which in their minds, might be considered as sufficient notice.

The court erred in the twelfth pargaraph of its main charge, because the court tells the jury that if the defendant company before the injury to the plaintiff, had notice of the fact that the throttle valve was leaky without regard to the time when leaky, and without regard to repairs on same after notice, if the jury believed that even pior to said notice, and even prior to said repairs and restoration of said throttle valve the defendant had been negligent, that then, in that case, plaintiff might recover. And the court further erred in said paragraph twelve, in which it tells the jury that if the said engineer Hoehn was in some manner or some respects guilty of negligence which contributed to or caused the moving backward of said engine and the injury to plaintiff, and notwithstanding the jury might believe that said Hoehn might have done something which he did not do, and that his doing such thing or things would have prevented the movement of the said engine and the injury to plaintiff, for although a person injured can not recover for an injury received by him in consequence of negligence on the part of his fellow servant, yet if concurring with the negligence of such fellow servant there is negligence on the part of the company itself in failing to exercise ordinary care to furnish reasonably safe machinery, and that such failure on the part of the company, if any, is the proximate cause of the injury complained of, that is, if such person would not have received his injury but for the negligence of the company, then the company is liable, notwithstanding the concurring negligence of the fellow servant.

The court erred in refusing to give defendant's special charge number 4 as follows: "At the request of defendant, I charge you that if you believe from the evidence that the two engines numbers 681 and 690 were moved by the carelessness or negligence of either one or both of the engineers in charge of said engine that then and in that event the plaintiff can not recover, and your verdict should be for the defendant." For the reason that the said charge was the law of this case, was called for by the evidence, and was not covered by the main charge, or by any other charge submitted to the jury.

The court erred in refusing to give defendant's special charge number 5 as follows: "At the request of the defendant, I charge you, that if you find from the evidence that Engineer Hoehn could have, by leaving his lever on center or by keeping the brake set or keeping open the cylinder cock, or by either one or more of them, in the ordinary manner, have kept his engine at a standstill at the time of plaintiff's injury, or if you believe from the evidence that by ordinary care in the use of the machinery and appliances furnished him he could have prevented the injuries to plaintiff, then and in that event plaintiff can not recover and your verdict must be for the defendant." For the reason that said charge

was the law of this case, was called for by the evidence, and was not covered by the main charge or by any other charge submitted to the jury.

*Patterson, Buckler & Woodson,* for appellee.

FLY, ASSOCIATE JUSTICE.—This is a suit for damages arising from personal injuries received by appellee while in the employment of appellant in the capacity of a fireman. It was alleged in the petition that on January 29, 1903, appellee in discharge of his duties went under his engine, which was attached to a train of freight cars behind, and to another engine in front, while the same was stopped at a station in Arizona Territory, for the purpose of cleaning out the ash box; that before going under the engine he had notified the engineer of the engine in front, but that while he was engaged in cleaning the ash box the two engines were moved backward and the back driving wheel of the engine he was under ran against and along his left arm from the wrist nearly to the shoulder and injured his arm so as to render it useless. The grounds of negligence are stated thus: "He says that his injuries were caused by the unexpected and involuntary movement of said engine that he was under, and said movement was caused through no fault of his own nor through the fault of either of the engineers in charge of said engines, but was caused from the fact that the throttle upon the front engine was in a leaky condition, which permitted the steam to escape and get into the steam chest and then from the steam chest into the cylinder upon the movement of the reverse lever of the engine, and that the defendant company, its agents, servants and employes, other than the engineer in charge of said front engine, knew of the leaky condition of said throttle, or in the exercise of reasonable care and inspection could have known of its leaky condition, and, knowing the same, negligently and carelessly permitted it to remain in that condition and to be used by its employes.

"He charges that a leaky throttle is very dangerous, which fact was well known to the defendant, and liable at any time to cause an engine to move involuntarily and to injure employes on or about such engine, and that when said steam escaped and got into the steam chest and the engineer in charge of said engine moved the reverse lever, this permitted the steam to get from the steam chest into the cylinder and thus caused both of said engines to be moved backward, causing plaintiff's injuries as above described.

"He charges that had said throttle not been leaky and had the steam not escaped into the steam chest, said reverse lever could have been moved without causing the said engine to move, and that on account of said leaky throttle and on account of said steam getting into the steam chest, the moving of the reverse lever would have the same effect in moving the engine as would a throttle valve being opened by the engineer, while, had such throttle not been in a leaky condition, said reverse lever could have been moved without its having any effect whatever toward moving the engine."

Appellant answered that appellee was a citizen of Arizona and that the injury occurred in that Territory; that the common law is in force in that Territory and that the injuries to appellee were inflicted through the negligence of a fellow servant, and not through the negligence of

appellant, and that it was not liable for the negligence of the fellow servant. The cause was tried by jury and resulted in a verdict and judgment for $7,500 in favor of appellee, of which amount appellee remitted the sum of fifteen hundred dollars.

Appellee was injured in Arizona. Before going under the second engine, of which he was fireman, he notified the engineer of the engine in front, which was attached to his engine, that he was going under the latter to clean the ash box and asked him not to move. There was a conflict on this point. While under the engine engaged in his work the front engine gave three blasts of its whistle and backed against the engine under which he was working so as to move it and run one of the driving wheels along his left arm and tear the flesh and muscles from it. On the subject of what caused the movement of the engine there were two witnesses testified, the engineer and fireman on the front engine. Hoehn the engineer testified as follows: "My name is R. C. Hoehn, I reside at No. 4303 Fifth Ave., South Avondale Station, in the city of Birmingham, Jefferson County, Alabama. My occupation is that of locomotive engineer and I have been such since the year 1888. I am acquainted with the plaintiff, Thomas Seeger, and have known him since the latter part of January, 1903. My occupation and that of plaintiff at and immediately prior to the 29th of January, 1903, was that of locomotive engineer and fireman, respectively, and as such were at that time in the employment of the Atchison, Topeka & Santa Fe Railway Company, on the Albuquerque Division, Third District, running between Winslow and Seligman, in Arizona. While in the employment of said railroad I became acquainted with engine number 681, owned or used by said company. Prior to January 29, 1903, when I was in extra gang, I used said engine frequently, but had run it only twice in the month of January, 1903. There was a leakage of steam in said engine number 681, but I do not know where it was, as I did not go into the boiler to examine it. I do not know how long said engine had been in such condition prior to said date, nor how long it remained after January 29, 1903, if at all. A leaky throttle in the engine would cause such to start off if the lever were down and all brakes off. An engineer would have no control over the movements of such an engine in such condition. I knew that the plaintiff was injured while engaged as a fireman on engine 690, on the 29th of January, 1903, at Williams, on the Albuquerque Division of the Atchison, T. & S. F. Ry. Co. He was under engine 690, my engine number 681 had moved backwards about three feet, consequently engine 690 moved also (under which he was), said last mentioned engine being coupled to my engine 681. I blew the back-up signal and put down my lever and my engine started off backwards. I was blown down immediately by Engineer Lancaster of engine 690 and applied the brake in emergency. I did not know he was under the engine nor had anybody told me. The main train had been detached from the train on account of the heavy road and heavy grade on that district, where it was customary to couple two or more engines together for the reason stated. I made a report as to the condition of the throttle valve of engine 681 after we reached Winslow, about ninety miles from Williams, where the accident occurred. I am the same R. C. Hoehn who was engineer in the freight service of the Atchison, T. & S. F. Ry. Co.

coast line during month of January, 1903. I was on the Albuquerque
Division at that time. I was engineer on engine 681 engaged in freight
service on the 29th of January, 1903, and was engineer at the very time
plaintiff was injured at Williams, he was injured at about twelve o'clock
on said date. There were present, besides myself and Mr. Seeger at
that time, my fireman, J. D. Lancaster, engineer on number 690, a brake-
man and a coal chute man. Pete Wright was the conductor of said train.
I did not know J. D. Lancaster, he was running said engine 690, as
engineer thereof. I could have held the engine from moving, together
with the attached engine, by the brake, for a time, and by keeping the
lever on the center. I used these precautions up to the time I got ready
to move. I put the reverse lever down and the engine, together with
number 690, moved backwards, I blew the signal and was intending
to wait until I got an answer, which came, but it was not what I ex-
pected, it was a blow down—a stop signal. The rules say you must
sound your whistle before moving. It was only as a matter of safety
we gave an answer. The rules require that you blow the whistle or ring
the bell before moving, but do not say anything about an answer. It
would be a man's duty who wanted to go under an engine to notify the
engineer of his intention to do so as a matter of personal safety. What-
ever part of the engine was leaking steam at the end of the trip was
leaking at Williams. Winslow is the usual place to make such report
and examination and I made mine there of engine 681 in the work book
at the round house, as required by rule number 480, in Rule Book.
There was a leak in engine number 681, but I do not know where it was.
The plaintiff Seeger was under said engine number 690, but when and
how he came there I do not know. I did not know that he was under
the engine at the time, nor had any body told me about his going
under there. The two engines moved as I have already stated, when
plaintiff was injured. There was a leak of steam in my engine some-
where. There was something leaking certainly—that is to say, there was
certainly a leakage of steam in said engine number 681, but whether it
was in the throttle or some other part of the steam rigging, I do not
know; because I could not get inside of the boiler to see and examine
it. I tested the engine when I got to Winslow, for my own satisfaction,
and found that there was a leakage of steam somewhere in the engine,
and I knew that such was the case at the time of the accident. I was
not positive about the engine having a leaky throttle in my report of the
accident, because I did not go into the boiler to examine it, and there is
no way of telling what part of the steam pipes are leaking without taking
them out and examining them. I did not know that said fireman was
under engine number 690. The plaintiff Seeger did not notify me that
he was going under engine number 690 for the purpose of cleaning his
engine. As a matter of precaution and of personal safety he should have
notified me that he was going under said engine, so that I could have
used extra precaution to keep my engine from moving. It was his duty
as a matter of personal safety to have notified me of his intention to go
under said engine number 690. It would not have been wrong or unusual
for me to move my engine, together with engine number 690, either for-
ward or backward, by applying steam, if I did not know he was under
said engine number 690, nor would I have done so in any case if I had

knowledge of his being under the engine, whether the throttle was leaking or not. I could have held the engine from moving, together with the attached engine, by the brake, for a time, and by keeping the lever on the center. I used these precautions up to the time I got ready to move. I put the reverse lever down and the engine, together with number 690, moved backwards. If I had known that the plaintiff had gone under the engine number 690 at the time and place inquired about, to clean the ash pan of his engine, or for any other purpose, notwithstanding the fact that the throttle of my engine may have been leaking I could have kept my engine standing, because I would have used extra precautions. My engine was stationary when I blew the three blasts, and it remained stationary until I released the air brake. I could have held my engine under full control, but I would have gone out of my way to do it. I would have had to use unusual precautions to do it. If the plaintiff had notified me that he was going under said engine number 690, at the time inquired about, I certainly would have kept my engine at a standstill."

The fireman on the front engine testified as follows: "My name is Otto Glessner. On the 29th of January, 1903, I was somewhere about Williams, Arizona. I have known the plaintiff for about four years, had known him about three months prior to the time he was injured in Winslow, Arizona. I knew one R. C. Hoehn and J. D. Lancaster, who were engineers at the time. I was fireman for Engineer Hoehn on engine 681. There were two engines, I was firing on first engine, and were headed east, going from Seligman to Winslow. Before the injury occurred, Mr. Seeger was firing on second engine, he asked me for my ash hoe and said he would have to clean his pan, so I gave him the hoe, he said: 'Be careful and don't move the engine, I am going under the engine to hoe the pan.' During this time I had taken coal or water and Mr. Hoehn oiled his engine, looked it over and then stepped on the engine and while I threw the water spout around he blew three blasts of the whistle and started to back up, I was standing in the rear of the engine and told him not to move because Tom was under the ash pan. I think the engineer on the second engine blew one blast of the whistle which whistled him down, by that time he had moved four feet. I heard Tom hollow and knew he was run over by the engine. When Engineer Hoehn got up on the engine and reversed the lever, it was in a forward motion and he opened the throttle and moved the engine. It was in a forward motion and he caught hold of the lever and threw it in a backward motion, blew his whistle, and after he let go of the whistle cord, he took hold of the throttle and opened it, and the engine moved four feet. At the time he reversed the lever I was standing on the back of the tender on the coal, above him. To start an engine the reverse lever should be put down which way you want to move the engine and pull the throttle. At the time I saw Mr. Hoehn open the throttle valve I was standing up on the tank—the tender of the engine. I had either got through taking water or taking coal, about eighteen feet away. Mr. Hoehn was what you might call an engineer— I never knew him to murder any body, every body moved out of his way. I am now working in the Indian Territory as a plumber, am not working for any railroad."

It was admitted that the common law was in force in the Territory of Arizona, and that the engineer was a fellow servant of appellee, and as appears from the pleading the only ground of recovery was the defective condition of the engine. The front engine was defective in some part of it so as to allow steam to escape at the time the injury occurred, and about two weeks prior to that time the main throttle valve may have leaked. There was testimony tending to show that if the throttle of an engine is in a leaky condition and steam escaped into the cylinder it would cause the engine to move in the direction in which the reverse lever might be turned. When steam can not escape from the throttle into the cylinder the movement of the lever would not cause the engine to move. If the engineer had not moved the reverse lever on the front engine it would not have moved.

It will be noted that the engineer did not swear that he did not open the throttle of his engine nor did he state that the engine started without his desiring it to do so, but on the other hand he stated that he could and would have kept it from moving if he had known that appellee was under the other engine, and that he had kept the engine from moving until he got ready to move. The fireman swore that the engineer not only threw the lever but opened the throttle. The conclusion from the evidence is irresistible that the engines were moved through the agency of the engineer on the front engine.

If the engineer on the front engine knew that appellee was under the rear engine he owed him the duty of using every means in his power to prevent the engines from moving and injuring him. It would not matter that he would be compelled to hold the engine stationary in a different method, than if it had been in a state of good repair, if he could have kept it from moving it was his bounden duty to use the means within his power to control the engine. That he could have controlled it is testified to by him, and is disputed by no one. He did not state that he did not know that the movement of the lever would start the engine, but on the other hand he moved it with that end in view. He stated that he could have kept the engine from moving by the brake and by keeping the lever on the center. When he got ready to go he testified that he loosed the brake and moved the lever and the engine moved. It did exactly what he expected and wished it to do. He said: "I could have held the engine from moving, together with the attached engine, by the brake, for a time, and by keeping the lever on the center. I used these precautions up to the time I got ready to move. . . . If the plaintiff had notified me that he was going under said engine 690, at the time inquired about, I certainly would have kept my engine at a standstill." It is true that he said that he would have had to use "unusual precautions" to hold the engine, and those precautions should have been used. Under the circumstances of the case, when appellee was at work in a very dangerous place the engineer should have used reasonable care to have protected appellee from danger, which means care proportioned to the danger to be guarded against. Reasonable care in this instance was great care. As said in Railway v. Smith, 87 Texas, 348: "Ordinary care will require the exercise of a very great degree of vigilance under some circumstances, and the amount of vigilance and caution to be used will vary according to the situation of the parties and

the surrounding circumstances." Ordinary care in this case was the use of every precaution to prevent the engines from moving when it was known that appellee was underneath one of them at work. (San Antonio Street Ry. v. Mechler, 87 Texas, 628.)

It is true that if the negligence of appellant in furnishing a defective engine concurred with the negligence of the engineer in producing the result, appellant would be liable, but there was no such concurrence. The engineer was the active agent in moving the engines. He knew the condition of the engine and knew that it would move if the lever was turned and the brakes loosed, and he turned the lever and lifted the brakes. It was as much his act as though it had been necessary, as in case of a perfect engine, to reverse the lever, take off the brakes and open wide the throttle. That he had knowledge of what was necessary to keep the engine stationary is shown by the fact that he held it still until he wanted to move. He nowhere says that he did not know the engine would move when he turned the lever and took off the brakes. This testimony might have been elicited from him but it was not.

As has been said in numerous cases the proximate cause is not necessarily the nearest cause, but the act of negligence must, in order to be the proximate cause, have been the cause which under the ordinary working of natural laws would probably have produced the result. (Texas & Pac. Ry. v. Bigham, 90 Texas, 223; Shippers Compress Co. v. Davidson, 35 Texas Civ. App., 558; Ray v. Pecos & N. T. Ry. (Texas Civ. App.), 88 S. W. Rep., 466.)

In the case of Milwaukee Ry. Co. v. Kellogg, 94 U. S., 469, which is quoted with approval in the Bigham case, the Supreme Court of the United States stated that "in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances."

There is not a circumstance found in the record that tends to show that the engine had ever moved without the active agency of some one exerted either by pulling the lever and taking off the brakes or opening the throttle. It did not move on the occasion in question until it had been prepared for moving by the engineer in charge of it. He was the active agency that caused it to move, and until the agency had been exerted it remained firm in its place. Without the active intervening agency of the engineer it would never have moved. The active cause that produced the injury was independent of the leakage of the engine and not connected with it. As said in the Kellogg case, heretofore cited: "The inquiry must, therefore, always be whether there was any intermediate cause disconnected from the primary fault, and self operating, which produced the injury. Here lies the difficulty. But the inquiry must be answered in accordance with common understanding. In a succession of dependent events an interval may always be seen by an acute mind between a cause and its effect, though it may be so imperceptible as to be overlooked by a common mind. Thus, if a building be set on fire by negligence, and an adjoining building be destroyed, without any negligence of the occupants of the first, no one would doubt that the destruction of the second was due to the negligence that caused the

burning of the first. Yet in truth, in a very legitimate sense, the immediate cause of the burning of the second was the burning of the first." So in this case, if the engineer had not intended to start the engine and he did not know that his use of the lever and the brakes as he used them would start the engine, then the intervention of the engineer would not break the line of connection between the negligence of appellant in furnishing the leaky engine and it would be liable. But the engineer stated that he had the engine under control and would not have moved it if he had known appellee was under the rear engine. He was the active independent agent that caused the injury.

Usually the question of what is the proximate cause of an injury is one to be solved by a jury, but there must be some evidence to sustain a finding as to the proximate cause, as is required in the establishment of any fact. Too much has been left to inference in this case. The engineer knew whether he opened the throttle or not, but he was not asked that question, and did not say he did or did not open it. He knew whether the engine moved in response to his act or not, and yet he does not swear positively about it, although the plain inference is that it did.

No witness testified that the throttle was leaking at the time of the accident. The engineer on the front engine swore that there was a leakage but that he did not know where it was, and the other engineer stated that he knew nothing about the condition of the front engine on the day the injury was inflicted. The only evidence introduced as to the condition of the throttle was reports made by engineers on January 2, 5, 10 and 13, 1903, in which it was stated, "main throttle valve leaks." The book showing those reports also showed that the throttle had been repaired. Appellee having introduced the engine books of appellant to show reports of the date hereinbefore named, appellant sought to introduce the same books to show that only two days before the injury was inflicted the engineer on number 681 had reported as follows: "Wash boiler. Caulk all leaks in fire box." This was material in view of evidence that the former leaks in the throttle had been repaired, that engineers were required to report all defects, and that an engine could not move when the throttle had not been opened, unless there was a leakage from it. The leakage in the throttle was one of the most important factors in the prosecution of the case, and any fact tending to show that it leaked or did not leak should have been admitted. Surely, after appellee had introduced a part of the reports as to the condition of the engine appellant should have been permitted to use the last report, in the same book introduced by appellee, on the same subject. Justice would demand the enforcement of such a rule.

Had the facts been sufficient to justify it, there was no error in the charge complained of in the fifth assignment of error. It did not assume the existence of any facts. It not only made it necessary that appellant had been notified of the condition of the engine, but that it had notice at that time. However, under the positive proof that the throttle had been opened by the engineer, which was not denied by him, the charge presented a state of facts not sustained by the evidence. The evidence was meagre as to the leaky condition of the throttle, if not totally ab-

sent, and there was no evidence of steam having escaped into the cylinder.

There is no merit in the sixth assignment of error, which criticises the tenth paragraph of the charge. We believe the twelfth paragraph of the charge stated the law of the case.

The special charges whose rejection is complained of in the ninth and twelfth assignments of error, ignored the idea of concurrent negligence on the part of appellant and the fellow servant and were properly refused. The other points raised have been covered by the law as enunciated in this opinion.

We do not consider that this case has been developed as it is capable of being developed and do not feel disposed to render judgment, but the judgment will be reversed and the cause remanded.

*Reversed and remanded.*